## SECURITY UNION CASUALTY CO. v. BRITTON. (No. 2817.)

Court of Civil Appeals of Texas. Amarillo. April 20, 1927.

Rehearing Denied May 18, 1927.

1. Master and servant ⊝⊃405(6)—Evidence held to sustain finding of total permanent disability of employee.

In suit to set aside award of compensation to injured employee, evidence that employee, injured in explosion, suffered fractured skull, burns about body, and broken leg, which was not fully reset, was sufficient to sustain finding of total permanent disability from performing manual labor.

2. Appeal and error ⊝⊃232(1)—Appellant will not be regarded as intending to except to special issue subject to objection, where exception recited unobjectionable special issue.

Where insurer seeking to set aside compensation award excepted to submission of special issue No. 9, which was not subject to objections made, it cannot be said on appeal that insurer intended to except to special issue No. 8, which was subject to objection.

3. Master and servant ⊝⊃417(4)—Award on basis of wage of similar employees held not fundamental error, where lump sum award was not in excess of earnings.

Where injured employee was earning $4.50 per day, error, if any, in awarding compensation on basis of daily wage of similar employees, which was $5 per day, held not fundamental error, where lump sum award did not show that amount allowed was in excess of wage earned by employee.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Suit by the Security Union Casualty Company against Richard M. Britton to set aside an award of the Industrial Accident Board, in which defendant filed a cross-action. Judgment for defendant, and plaintiff appeals. Affirmed.

Thomas, Frank, Milam & Touchstone, of Dallas, for appellant.
Bullington, Boone, Humphrey & King, of Wichita Falls, for appellee.

RANDOLPH, J. This suit was filed by the appellant as plaintiff against appellee as defendant. The plaintiff's petition alleges that an award had been made by the Industrial Accident Board of Texas on February 25, 1926, with which the plaintiff was dissatisfied.

By agreement it was shown that the appeal to the district court was properly taken from the award of the Industrial Accident Board, and the agreement further showed that on the date of the alleged injury in this case the plaintiff was carrying compensation insurance on the employer of the injured

party, and that proper claim for compensation had been made.

In his answer and cross-action, defendant, Britton, alleges that on the 30th day of October, 1925, while working for Bradford Supply Company in Wichita county, Texas, he sustained certain personal injuries, which had totally disabled him from labor. He prays for his weekly compensation to be made in a lump sum settlement.

The case was tried before a jury upon special issues, and on their answers to such issues the trial court rendered judgment for the defendant in the lump sum of $5,501.01.

In answer to the special issues submitted, the jury found that the defendant was injured by the boiler exploding October 30, 1925; that such injuries totally incapacitated defendant from work; that such total incapacity was permanent; that the average daily wage of employees similar to the defendant for a year prior to October, 1925, was $5; that the failure to allow a lump sum settlement would result in a manifest hardship and injustice to the defendant.

The case is presented to this court upon three propositions, but proposition No. 2, that the defendant did not allege in his pleading that he was totally and permanently disabled as a result of his injury, was abandoned by appellant in oral argument in this court; hence only propositions 1 and 3 will be considered by us.

Proposition No. 1 is:

"The finding of the jury in this case that Richard M. Britton had suffered total permanent disability was unsupported by any testimony whatsoever in that the only competent testimony as to his alleged disability and its probable duration was that of Dr. E. L. Hargrave and Dr. V. B. Lee, neither of whom testified that said Britton would be totally and permanently disabled, and the latter testified that in his opinion the said Britton would be able to do work within six months from the date of the trial."

[1] The evidence abundantly sustains the verdict of the jury, as will appear from the following statement. The witness Thomas testified: That he was working for the Lomax Drilling Company, drilling in the Barkley-Meadow pool in Wichita county. That he had never seen the defendant until the date of the accident. That he was on the derrick floor on the day of the accident. The Bradford Supply Company was building a power plant on the Lomax lease, something like 1,500 feet away from where witness was working. That he went on duty at 7 o'clock the morning of the accident, and witness saw Britton about 8:30 on the west side of the derrick. From the first time that the witness saw Britton on the west side of the derrick, it was not more than three or four minutes to the time when the boiler blew up. After the explosion he saw Britton between the place where the boiler blew up and the slush pit, about 12 or 15 feet from the tool house where he found him. This witness testified:

"Well; he was in a pretty hard condition when I found him. Looked like he was practically ruined—blood and water all over him. Just looked like a big ball of mud, big blubbers of blood coming out of his mouth and nose, and oodles of blood running out of his ear; just never did see so much blood and water. He was sorter lying on his left side, I did not take time to examine him. I went to look for the fireman and the rest of the boys. Before I left him I raised his head up. At that time he seemed unconscious. We sent him to Archer City first and afterwards he was carried here [Wichita Falls]."

Tom Ireland testified substantially: That he is an oil field worker, building power stations, putting them in. Defendant worked for him. The witness was building a power plant for the Lomax people. He was working for the Bradford Supply Company under Mr. Call. When Call was away, witness was in charge. On the morning of the accident, they were running a floor and in this work needed another wrench. Witness told defendant to go to one of the rigs and get it. Defendant never said anything. Witness never saw defendant any more. "He just went" and never came back. About 30 minutes after, witness heard a noise. He did not know what it was at that time. He looked and saw smoke or fog. He went over there in about an hour, having heard about one of the men getting killed and also that one of the men who worked for him had been hurt. When witness got to the place of the accident, the dead man was still lying there, but defendant was gone.

The defendant, as a witness for himself, testified substantially:

"I am 28 years old. I was raised in Kentucky. I have not had much education. I went to the seventh grade in school. I have been doing construction work all of my life, building powers, doing manual labor, never did much of anything else. I was working for the Bradford Supply Company in October last year, helping to build a power in Wichita county. I had been working for them three days on that job there. I had been at another place about three weeks. I was getting $4.50 at the time I went to work for the Bradford Supply Company. Previous to that I had been getting $5 per day. I worked six days a week and sometimes on Sunday. I knew the average daily wage that a man usually got, working on that kind of work, averaged about $5 or $5.50. I was getting $4.50 because I could not get anything else to do, could not get any better wages at the time."

Witness then related the incidents of the explosion:

"I got hurt on October 30th. I do not know how I got to the hospital; all that I knew is I was in the operating room; then I found out what had happened. I had a fractured skull and broken leg, and suffered a lot of pain, and

was burned on my leg and back above my hips, across the small of my back. I had a bad gash here (indicating head), a fractured skull, and a broken leg. My leg was sawed off. I do not know how much of my leg was sawed off, only what the doctors said, about two inches cut off and then notches cut into that piece and held that way together. It is not straight, hurts me some, hurts when I walk on it. I cannot walk on it without its hurting me. I have tried to walk on it; when I try to bear my weight on it, it causes me to fall. I do not think there was ever a union there—did not get a union. I have headaches from the injury to my head. On hot days I have a severe headache when I get out in the sun. In cloudy weather it does not bother me, but in cloudy weather my foot bothers me more—bothers me all of the time. I have not been able to do any work since I was hurt. I was in the hospital nearly five months. Since I have been out, the hospital has presented me with a bill; the ambulance people presented me a bill for $135; the doctors' bills were for three or four hundred dollars. Since I have been discharged from the hospital, I have not been able to do the same kind and character of work I was doing prior to the injury. $17.31 will not support me, given to me in weekly installments. If I were awarded a lump sum I would try to get into something where I could make a living. If I am awarded a lump sum settlement, I will go to some bone specialist and try to get my leg straightened. Without a lump sum of money being paid to me, I will not be able to do that. I am not able to perform the kind and character of work that I was performing and was capable of performing prior to the time I was hurt. No; I have no money or anything on the top side of earth that I know of."

Dr. Hargrave testified substantially: That he was called to attend the defendant in the Wichita General Hospital; that he remembered defendant had a broken leg, some burns about the body, a cut on the head. It was his diagnosis at the time that defendant had a basal fracture, a crack in the skull at the base of the brain. Such a fracture is usually accompanied by a bleeding of the nose and ears. Defendant had a broken leg that was loose, and it was necessary to remove a piece of the bone, piece of the big bone of the leg, the tibia or larger and inner bone of the leg, and the other bone outside, and witness brought those two pieces together and put defendant's leg in a cast. A good union was never obtained, and witness opened it up and notched both ends, dovetailed them. By dovetailing, witness explained that like a carpenter, he cut notches to fit into each other. The leg was shortened by cutting the notches in the lower part and notches in the center part.

Witness further testified as the basal fracture:

"You say that patient complained that in hot weather he has severe headaches, when he goes out in the sun, and you want to know if that is a possible or probable result of the fracture. Well; I will say that some of them do complain, after having had such an injury, of headaches and numerous other aches, and sometimes, of course, it is very hard to say; if a man did not have these headaches before, and he had an injury, and then suffered headaches, it is very probable and possible that they are due to the injury to the skull. That is where they had head injuries. As to whether a man 28 years of age, who for about eight or nine years prior to the injury was doing manual labor or construction work in the open, in the heat and the bad weather, and suffers an accident to his leg, as this man suffered, can he ever use that leg, as he did before the injury, whether he can do that kind of work, I will say, he cannot. As to whether or not because of the injury to the skull, when out in the sun he suffers headaches, it is impossible for me to say, but he now says it causes him pain, which is a very likely symptom. * * * The leg is not straight now. As to whether the leg can be made straight, well; you can break it over and set it again, and trust that you will get better results."

This witness also strongly advised against attempting another operation. "I think that he would possibly have to use a cane or some support."

This evidence clearly discloses that the defendant's ability to do manual labor has been totally destroyed. It was his only method of earning a living. He has no such education as would enable him to make a living in any other calling, occupation, or profession, and the law does not require the impossible of him. He may be possessed of the hope that never leaves the sanguine man, that some time things may get better, but the evidence discloses no reasonable basis for such hope.

We therefore hold that the jury's verdict of total and permanent disability is fully sustained by the evidence. Lumberman's Reciprocal Association v. C. A. Anders et al., opinion rendered by the Court of Civil Appeals at Beaumont and not yet published; United Fidelity & Guaranty Co. v. Weir (Tex. Civ. App.) 286 S. W. 565, 567; Home Life & Accident Association v. Corsey (Tex. Civ. App.) 216 S. W. 464, 466, and authorities therein cited; North American Accident Ins. Co. v. Miller (Tex. Civ. App.) 193 S. W. 750, 756 (writ denied); Commonwealth Bonding & Casualty Co. v. Bryant (Tex. Sup.) 240 S. W. 893; Id. (Tex. Civ. App.) 185 S. W. 979, 981.

Appellant urges, as fundamental error, that the defendant having been engaged in the same character of work as he was engaged in at the time of his injury, for more than a year prior to that time, that recovery of compensation should have been upon the basis of his average daily wage during the 12 months preceding his injury, and consequently it was fundamental error for the trial court to allow him to recover upon the basis of the average daily wage of employees en-

gaged in similar employment, there being no testimony that Britton's wages and that of such other employees were identical.

The trial court submitted to the jury the following special issue:

"Special issue No. 8. What was the average daily wage of employees similar to the defendant, Richard M. Britton, for one year next prior to October 30, 1925? Answer by stating in dollars per day."

This the jury answered: "$5."

Appellant claims that the following exception to the court's charge was leveled at this special issue No. 8, to wit:

"Plaintiff objects and excepts to the submission of special issue No. 9, because there is no evidence to justify its submission, and because the undisputed evidence shows the defendant, Britton, to have received the sum of $4.50 per day."

It will be understood that the defendant did not offer to the trial court any special issue curing the alleged error in the charge.

[2, 3] In fairness to the trial court, who, in the hurry of the trial, had his attention called to special issue No. 9, which on an inspection was not subject to the objection, we will not now say that the appellant intended to except to special issue No. 8; especially should this be held because the appellant's alleged exception to special issue No. 8, if it can be said that there was such an exception, complains of the court's allowing appellee compensation on the basis of the daily wage of similar employees, when from the data at hand, it is not made to appear that the amount allowed by the trial court is in excess of the wage earned by the appellee. This is true when we attempt to arrive at the infinitesimal ratio which $4.50 for 3 weeks bears to $5 for 49 weeks, and no fundamental error is shown.

There being no reversible error, the trial court's judgment is in all things affirmed.