[Nos. 13223-4-III; 13224-2-III.    Division Three.    June 9, 1994.]

LAYRITE PRODUCTS CO., ET AL, *Respondents,* v. EDWIN DEGENSTEIN, *Appellant.*

*Patrick K. Stiley* and *Pat Stiley & Associates, P.S.,* for appellant.

*Gregory M. Kane* and *Evans, Craven & Lackie, P.S.; Christine O. Gregoire, Attorney General,* and *Dennis J. Beemer, Assistant,* for respondents.

THOMPSON, C.J. — Edwin Degenstein appeals a judgment entered on a jury verdict which reversed a decision in his favor by the Board of Industrial Insurance Appeals. The Board's decision had countermanded an order of the Department of Labor and Industries demanding that Mr. Degenstein "refund . . . $42,290.26, plus a penalty of 50% . . . on the basis that such payments [for temporary total disability had] been induced by fraud." The Department's order was based upon its finding that Mr. Degenstein misrepresented his working status in his application for time-loss compensation. We affirm.

Edwin Degenstein injured his back on June 30, 1976, while employed by Layrite Products Company. The Department of Labor and Industries accepted his claim for benefits. The Department closed the claim on December 19, 1980, with an award for permanent partial disability. On April 13, 1987, Mr. Degenstein applied to reopen his claim. He received time-loss compensation for temporary total disability from April 8, 1987, through February 13, 1990.

Mr. Degenstein's wife, Kay, operated Inland Empire Taxi Company out of their home. In the fall of 1989, Thomas Moyles, Mr. Degenstein's vocational counselor, saw him at Perkins Restaurant in downtown Spokane. It appeared to Mr. Moyles that Mr. Degenstein was conducting a shift change for the taxi company. Mr. Moyles reported his suspicion to the Department of Labor and Industries.

During January and February 1990, Investigator Christopher Crouch monitored the cab company's radio dispatches and its shift changes at Perkins. He heard Mr. Degenstein dispatching for the company, and he took pictures of Mr. Degenstein with the company's drivers at Perkins. Mr. Crouch also observed Mr. Degenstein driving a taxi on February 1, 8, and 16; in each of these instances he dropped off or picked up customers.

The Department determined that Mr. Degenstein had obtained time-loss compensation fraudulently by misrepresenting or concealing his employment by the taxi company. It ordered him to repay $42,290.26 in time-loss

compensation, plus 50 percent of that amount as a penalty pursuant to RCW 51.32.240.[1] Mr. Degenstein appealed to the Board of Industrial Insurance Appeals. An industrial appeals judge conducted a hearing on this matter in the fall of 1991.

The industrial appeals judge held that the Department had not sustained its burden of proving by clear, cogent and convincing evidence that Mr. Degenstein fraudulently obtained time-loss compensation. She stated that "the Department must show a worker was earning sufficient income while receiving time loss compensation for the Department to have properly reduced his . . . benefits if the worker had truthfully reported his . . . earnings." She found no evidence that Mr. Degenstein's activities resulted in income to either himself or Inland during the time in question.

The evidence before the industrial appeals judge included the following: Mr. Degenstein testified that Inland owned four cabs, each of which generated about $1,400 a month in fares. He dispatched for Inland out of his living room on an irregular basis. He stated he may have picked up one or two fares in the winter of 1990 when none of the drivers were available. He admitted he was present during shift changes at Perkins, but he said his wife was also present and was in charge. Mr. Degenstein confirmed that he had been called for jury duty in 1988, and that the record of jury selection revealed he told the court he was the owner and operator of Inland Taxi. At the hearing, he characterized the foregoing as an "exaggeration". He received no compensation from Inland.

Several witnesses testified that their dealings with Inland had been conducted through Mr. Degenstein. Judith Ihli, a

---

[1] RCW 51.32.240(4) provides:

"Whenever any payment of benefits under this title has been induced by fraud the recipient thereof shall repay any such payment together with a penalty of fifty percent of the total of any such payments and the amount of such total sum may be recouped from any future payments due to the recipient on any claim with the state fund or self-insurer against whom the fraud was committed, as the case may be, and the amount of such penalty shall be placed in the supplemental pension fund. Such repayment or recoupment must be demanded or ordered within one year of the discovery of the fraud."

supervisor with the records division of the police department, stated that Mr. Degenstein brought in Inland's applications to operate vehicles for hire. She had the impression Mr. Degenstein was the person in charge of Inland, even though Mrs. Degenstein was also present and signed the checks for the application fees.

Charles Nicholson, an auditor for the Department of Labor and Industries, testified he dealt with Mr. Degenstein when he audited Inland in 1988, 1989, and 1990 to determine if the company was paying the proper amount of industrial insurance premiums. He was under the impression Mr. Degenstein was running the business.

Lynn Carlton, the properties and contracts manager at the Spokane airport, stated she was involved in bidding out the airport's taxi concession. She understood Mr. Degenstein was the owner and operator of Inland Taxi. He spoke on behalf of Inland at an airport board meeting in April of 1990.

Bernard Bidwell and David Swanson of Montana Rail, Inc., testified they dealt with Mr. Degenstein in connection with Inland's provision of transportation for Montana Rail's crews from January 1988 through April 1989. Mr. Bidwell estimated that Montana Rail paid an average of $4,000 a month in fares to Inland during that time.

Employees and former employees of Inland gave varying accounts of Mr. Degenstein's role in the company. Paul Davies worked for Inland between December 1986 and October 1989. He said both Mr. and Mrs. Degenstein were present when he interviewed for a job as a driver, but Mr. Degenstein asked most of the questions. He understood that Mr. Degenstein managed the company. During the time he worked for Inland, he observed Mr. Degenstein driving cab on an occasional basis, doing most of the shift changes, and repairing the cabs. Mr. Davies testified that Mr. Degenstein performed almost all of the taxi service for Montana Rail. He heard Mr. Degenstein dispatching two to three times a week for up to 6 hours at a time. Employee Shirley Van Gelder confirmed Mr. Davies' testimony about the signifi-

cant amount of time Mr. Degenstein spent dispatching. Employees Martha Chapman, Edward Reinders, and Dan Mayfield were of the opinion that Mrs. Degenstein ran the company and that Mr. Degenstein's role was only incidental — he took calls if Mrs. Degenstein or the regular dispatcher was busy and drove very occasionally as a substitute.

The Department also presented expert testimony that Mr. Degenstein was capable of gainful employment. However, the industrial appeals judge found that "the Department's own vocational and medical expert witnesses did not establish Mr. Degenstein was capable of gainful employment until February 1990".

As stated above, the industrial appeals judge ruled in favor of Mr. Degenstein. She held that absent expert testimony on the dollar value of his services to Inland, she could not conclude his activities disqualified him from receiving time-loss compensation.

The Board of Industrial Insurance Appeals adopted the findings and conclusions of the appeals judge. The Department appealed, and a superior court jury overturned the Board's decision. Mr. Degenstein unsuccessfully moved for a judgment notwithstanding the verdict, then appealed the superior court judgment to this court.

First, Mr. Degenstein contends there exists no clear, cogent, and convincing evidence that he was "gainfully employed", or "capable of gainful employment" and, therefore, not entitled to time-loss benefits for the pertinent time period. We address this issue within the context of jury instructions 9 and 16:

> Total disability is an impairment of mind or body which renders a worker unable to perform a gainful occupation with a reasonable degree of success and continuity. It is the loss of all reasonable wage earning capacity.
>
> . . . .
>
> If you should find that income was received by Inland Taxi Company as a result of Mr. Degenstein's services on behalf of Inland Taxi Company, you are instructed that the portion of income which results from Mr. Degenstein's services is attributable to Mr. Degenstein.

No exceptions were taken to these instructions.

■■ Under RCW 51.52.140, "[a]ppeal shall lie from the judgment of the superior court as in other civil cases". The appellate courts have interpreted this section as meaning that their role is "limited to an examination of the record to see whether there is substantial evidence to support the findings of the trial court made after the de novo trial in the superior court".[2] *Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 41, 395 P.2d 633 (1964); *Weatherspoon v. Department of Labor & Indus.*, 55 Wn. App. 439, 441, 777 P.2d 1084, *review denied*, 113 Wn.2d 1030 (1989). The prima facie presumption of the correctness of the Board's findings, RCW 51.52.115, controls the trial court's disposition only when it "finds itself unable to make a determination on the facts because the evidence is evenly balanced . . .". *Groff*, at 43; *Allison v. Department of Labor & Indus.*, 66 Wn.2d 263, 268, 401 P.2d 982 (1965).

The parties agree the Department has the burden of proving fraud and part of that burden includes showing that Mr. Degenstein's activities for Inland were such that his failure to disclose them on his monthly time-loss applications amounted to a misrepresentation of a material fact. They disagree as to whether the evidence establishes either that he earned any income or that Inland received income as the result of these activities.

Mr. Degenstein relies primarily upon *Kuhnle v. Department of Labor & Indus.*, 12 Wn.2d 191, 120 P.2d 1003 (1942). There, the claimant appealed a trial court's holding, as a matter of law, that the evidence was insufficient to support a finding he was permanently disabled as a result of a logging accident. The evidence showed he owned a small farm on which he raised farm animals and hay. *Kuhnle*, at 196. He testified he was able to do practically none of the work on the farm; he supervised his wife and children, who performed the needed tasks. *Kuhnle*, at 196.

---

[2]RCW 51.52.115 provides: "The hearing in the superior court shall be de novo . . .". "On appeal from the Board to the superior court there is a new trial, with the trier of fact reviewing the evidence in the record before the Board." *Bayliner Marine Corp. v. Perrigoue*, 40 Wn. App. 110, 113-14, 697 P.2d 277 (1985).

Kuhnle cited the decisions of other jurisdictions which had considered the phrase "incapacity to perform any work at any gainful occupation . . .", as used in various workers' compensation acts. Those courts agreed that the phrase did not mean the worker must be absolutely helpless or physically broken. *Kuhnle*, at 197 (citing, *e.g., Moore v. Peet Bros. Mfg. Co.*, 99 Kan. 443, 162 P. 295 (1917)). *Kuhnle* cited *Moore* for the proposition that a "workman [who] owns a small business . . . from which he is able to derive some income by supervising the work of others or performing minor tasks himself, does not necessarily . . . [have] wage earning capacity". *Kuhnle*, at 197.

█ *Kuhnle* stands for the general proposition that "gainful occupation" requires more than the worker exercise some control and management of a business of which he is the proprietor. Here, the instructions allowed Mr. Degenstein to argue his theory that his activity relative to the taxi company was limited and sporadic and, therefore, did not establish he had the capacity to perform those tasks as a full-time occupation. The jury rejected that theory when it returned a verdict for the Department.

Contrary to Mr. Degenstein's contention on appeal, the Department presented evidence of his wage earning capacity for the time period in question sufficient to support the verdict. Specifically, the testimony of Mr. Crouch, Mr. Davies, and Ms. Van Gelder was that he regularly engaged in tasks such as dispatching, driving for Montana Rail, and repairing cabs, which one would expect to be performed by a compensated employee. The jury could reasonably infer from these facts that Mr. Degenstein's activities generated income to Inland and, consequently, to him. Thus, his failure to advise the Department of his activities constituted a misrepresentation of material fact sufficient to support the verdict.

█ Second, Mr. Degenstein assigns error to instruction 10, which reads:

It is the duty of an applicant for worker's compensation benefits to disclose truthfully and completely all material mat-

ters required in any claim or application on forms prescribed by the Department.

Mr. Degenstein argues the foregoing instruction was duplicative of other instructions and a comment on the evidence by the court. We have read all the jury instructions and see no duplication. Instruction 10 is a correct statement of the law; it is not a comment on the evidence. There was no error.

Affirmed.

MUNSON and SCHULTHEIS, JJ., concur.

Review denied at 125 Wn. 2d 1011 (1994).